IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LONNIE EDMONDS                                                                                               PLAINTIFF

VS.                                                                                  CIVIL ACTION NO. 3:15cv871-FKB

CAROLYN W. COLVIN, COMMISSIONER                                                        DEFENDANT
OF SOCIAL SECURITY ADMINISTRATION

_____

MEMORANDUM OPINION AND ORDER

This cause is before the Court regarding the appeal by Lonnie Edmonds of the Commissioner of Social Security's final decision denying Edmonds's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits. In rendering this Memorandum Opinion and Order, the Court has carefully reviewed the Administrative Record [8] regarding Edmonds's claims (including the administrative decision, the medical records, and a transcript of the hearing before the Administrative Law Judge ("ALJ")), Plaintiff's Motion for Summary Judgment [11], Memorandum Brief [12], and Defendant's Motion for an Order Affirming the Commissioner's Decision [13] with supporting memorandum [14].  The parties have consented to proceed before the undersigned United States Magistrate Judge, and the District Judge has entered an Order of Reference [10].  28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

For the reasons discussed in this Memorandum Opinion and Order, the Court finds that the Commissioner's decision should be affirmed.  Accordingly, Plaintiff's appeal is denied, and Defendant's Motion for an Order Affirming the Decision of the Commissioner [13] is hereby granted as set forth in this Opinion.

I. PROCEDURAL HISTORY

On October 14, 2010, Edmonds filed for DIB and SSI, asserting an onset date of October 1, 2009. [8] at 290, 326.[1] Edmonds was born on May 8, 1962, and he was forty-eight years of age as of the date of his application. *Id.* at 321. Thus, he was considered a "younger person" under the regulations. 20 C.F.R. § 404.1563(c). During the pendency of his application, he turned 50 years old, and he became classified as a "person closely approaching advanced age." 20 C.F.R. § 404.1563(d). Edmonds attended school until twelfth grade in regular classes, but he did not graduate, and he never achieved a GED. [8] at 153. In his request for disability, Edmonds alleged that he is disabled due to a broken pelvic bone, stomach problems, chest pain, and knee problems. *Id.* at 326. Edmonds last worked in October 2009 as a chicken catcher, *id.* at 401, and he worked primarily in the chicken industry from 1983 to 2009. *Id.* at 331.

The Social Security Administration denied Edmonds's application initially and upon reconsideration. *Id.* at 241, 252. Edmonds requested a hearing, which was held on September 5, 2012. *Id.* at 145. On December 28, 2012, the ALJ issued a decision finding that Edmonds was not disabled. *Id.* at 221. After an appeal, the Appeals Council remanded the case to the ALJ for reconsideration on December 3, 2013. *Id.* at 236. After two more hearings on April 15 and September 16, 2014, *id.* at 31-60, 80-125, with consideration of additional medical evidence, the ALJ issued the unfavorable decision on appeal in this case on October 14, 2014. *Id.* at 9.

## II. MEDICAL HISTORY

Plaintiff's medical records are comprised primarily of emergency room visits and consultative examinations performed during the application for benefits process. According to the records, in January 2010 he told a consultative physician, Dr. William M. Lewis, that he was

---

[1]Citations reflect the original pagination of the administrative record.

unable to work because of pain in old pelvic fractures, shortness of breath, and his right knee giving out. *Id.* at 401. After examining Edmonds, Dr. Lewis gave the following diagnoses: hypertension, cigarette smoker, dizziness of unknown cause, osteoarthritis of the right knee, sacroiliac and posterior iliac crest pain since a fracture greater than ten years prior to the examination, and status postop laparotomy for stab wound to the abdomen. *Id.* at 403.

On May 30, 2010, Edmonds sought emergency care when a log rolled onto his left foot. *Id.* at 448. X-rays taken at that time showed no abnormality, but the examining doctor fitted him with an orthopedic splint, gave him pain medication, and concluded that Edmonds had fractured his left foot. *Id.* at 447, 449. Three days later, complaining of pain and swelling in his left foot, Edmonds sought care from the University of Mississippi Medical Center ("UMMC"). *Id.* at 409. X-rays at that time showed closed fractures of the left fourth metatarsal, left first cuneiform, and left second cuneiform. *Id.* at 411. He was discharged with instructions to follow up with the University orthopedics clinic two weeks later. *Id.* He testified that doctors fitted him with a boot that he wore about six months, and that he took it off on his own when it improved. *Id.* at 161.

A January 26, 2011, consultative x-ray of his left knee showed mild to moderate arthritis, a "bony protuberance arising off the outer margin of the superior portion of the medial femoral condyle," and a small calcification that reflected a chronic MCL injury. *Id.* at 430.

On May 2, 2011, Edmonds was treated for closed fractures of his right fibula and tibia. *Id.* at 443-445, 451, 459. The medical records indicate that Edwards sustained the injuries when he fell off a horse, but Edwards testified that he was trampled by some horses and cows. *Id.* at 163-166. One day later, he underwent surgery in which doctors at UMMC inserted a plate to

reduce the fractures and aid in healing. *Id.* at 519-522. The records indicate that he sought follow-up care from UMMC, and June 9, 2011, doctor's notes indicate that he was "doing well overall." *Id.* at 533.

After Edmonds's first hearing on September 5, 2012, the ALJ ordered consultative x-rays. On September 26, 2012, x-rays were obtained of Edmonds's right and left knees, and his spine at the Madison River Oaks Medical Center. *Id.* at 541. The radiologist found "[m]ild tricompartmental degenerative change" present about both knees. *Id.* In addition, the radiologist noted a healing fracture on the right proximal fibula, but also commented that the area was only partially imaged. *Id.* The doctor recommended formal imaging of the fibula. *Id.* The x-rays of the lumbar spine revealed "a number of chronic changes, but no acute pathology" was identified. *Id.* at 546. On the same date, a CT of the head without contrast was performed and indicated "no acute intracranial abnormality." *Id.* at 544.

Dr. Robert E. Tatum performed consultative orthopedic examinations of Edmonds on October 6, 2012, and May 10, 2014. *Id.* at 553, 580. In October 2012, Dr. Tatum's impression was that Edmonds's history of a fractured pelvis was a mild impairment to him, although he had some arthritic complaints. *Id.* at 555. Dr. Tatum gauged Edmonds's right knee problem, status post-surgery, to be a moderate impairment "with respect to bending, standing, stooping, lifting, reaching, pushing, pulling, kneeling, crouching, etc." *Id.* The doctor also found that the right knee problem affects Edmonds's "ability to reach, push, pull, stand, lift, etc." *Id.* As an orthopedist, Dr. Tatum noted Edmonds's complaints of chest pain and recommended further evaluation of the complaints. *Id.*

As a part of the exam, Dr. Tatum completed a "Medical Source Statement (Physical)."

*Id.* at 549-552.  Dr. Tatum found that Edmonds could occasionally lift and carry (including upward pulling) a maximum of twenty (20) pounds for a total of about one-third of an eight-hour workday.  *Id.* at 550.  The doctor stated that Edmonds could frequently lift and carry a minimum of ten (10) pounds for a total of about two-thirds of an eight-hour workday.  *Id.*  Dr. Tatum found that Plaintiff could stand and walk a total of three hours in an eight-hour work day, for thirty (30) minutes without interruption.  *Id.*  He also concluded that Edmonds did not need the use of a cane to ambulate.  *Id.*  The doctor described that Edmonds could sit for a total of five hours and forty-five (45) minutes without interruption.  *Id.* at 549.

Dr. Tatum found that Edmonds's postural activities were affected by his physical condition.  The physician concluded that Edmonds should balance and crawl only occasionally during the day.  And he determined that Edmonds should never climb, stoop, crouch, or kneel.  *Id.*

Dr. Tatum found that Edmonds's physical functions were also limited by his impairments.  Edmonds's reaching, pushing/pulling, and seeing were described as occasionally limited.  *Id.* at 549, 551.  The doctor determined that Edmonds's handling (gross manipulation) and fingering (fine manipulation) were frequently limited by his impairments.  *Id.*  The doctor marked that Edmonds's feeling (skin receptors) were constantly affected by his condition.  *Id.* at 551.  The doctor found that Plaintiff's hearing and speaking were not affected by his impairments.  *Id.*  He commented that the patient has moderate osteoarthritis in hands, shoulders, and knees, supported by clinical findings of decreased range of movement in hands, knees, and hips, as well as crepitation in right greater than left knee, and right greater than left shoulder, with tenderness in his joints.  *Id.*

The doctor also concluded that the following environmental restrictions were caused by his impairments:  heights, moving machinery, and temperature extremes.  *Id.* at 552.  Dr. Tatum found no environmental restrictions regarding dust, odors, fumes, pulmonary irritants, noise, humidity, and vibration.  *Id.*  Dr. Tatum determined that the limitations, to the degree listed in the report, are normally expected from the type and severity of the diagnoses in the case.  *Id.*  The doctor stated that the diagnoses in the case were confirmed by objective findings.  *Id.*  He also stated that he did not base his opinion on the patient's subjective complaints.  *Id.*

In his May 10, 2014, consultative evaluation of Edmonds, Dr. Tatum again noted Edmonds's history of a broken pelvis, characterizing it as a "mild impairment to the claimant who would benefit from being on nonsteroidal anti-inflammatory medications." *Id.* at 582.  The doctor stated that Edmonds's knee problems were a "moderate impairment to the claimant with respect to standing, sitting, squatting, stopping, etc.  He likely has some ligament laxity that is noted."  *Id.*  Dr. Tatum described claimant's chest pain as "more mild in nature and likely what the claimant needs is an EKG and/or some lab work to assess for cardiovascular disease."  *Id.*  Dr. Tatum stated that a chest x-ray would be "appropriate," related that he could give no further assessment as to cardiovascular issues, and stated that claimant's history of hypertension "also likely plays as well."  *Id.*

In addition, Dr. Tatum also completed another "Medical Source Statement (Physical)."  *Id.* at 584.  In the May 2014 assessment, Dr. Tatum found that some of Edmonds's conditions had degraded from the October 2012 evaluation, while others had improved.  Dr. Tatum determined that Edmonds could occasionally lift and carry (including upward pulling) a maximum of ten (10) pounds for a total of about one-third of an eight-hour workday.  *Id.* at 584.

˘6˘

The doctor found that he could not assess Edmonds's ability to frequently lift and carry. *Id.* On the other hand, Dr. Tatum concluded that Plaintiff could stand and walk a total of four hours in an eight-hours work day, for thirty (30) minutes without interruption, versus the total of three hours that he found in 2012. *Id.* Dr. Tatum again discussed that Edmonds did not need the use of a cane to ambulate, and he also found that Edmonds could use his free hand to carry small objects, whereas in 2012, the doctor did not complete that part of the form. *Id.* at 584, 585. The doctor reasoned that Edmonds could sit for a total of six hours, and one hour without interruption, which was an improvement. *Id.* at 585.

In 2014, Dr. Tatum found that Edmonds's postural activities were affected by his physical condition. The physician determined that Edmonds should balance, crouch, and kneel only occasionally during the day. He also noted that Edmonds should never climb, stoop, or crawl. *Id.*

Dr. Tatum again concluded in 2014 that Edmonds's physical functions were also limited by his impairments. Edmonds's reaching and pushing/pulling were described as occasionally limited. *Id.* at 585-586. The doctor determined that Edmonds's handling (gross manipulation), fingering (fine manipulation), feeling (skin receptors), seeing, hearing, and speaking were not limited by the impairments. *Id.*

The doctor also determined that the following environmental restrictions were caused by his impairments: heights, moving machinery, temperature extremes, and humidity. *Id.* at 587. Dr. Tatum found no environmental restrictions regarding dust, odors, fumes, pulmonary irritants, noise, and vibration. *Id.* Dr. Tatum confirmed, once again, that the limitations, to the degree listed in the report, are normally expected from the type and severity of the diagnoses in the case.

˘7˘

*Id.* The doctor stated that the diagnoses in the case were confirmed by objective findings, and he again stated that he did not base his opinion on the patient's subjective complaints. *Id.*

In the meantime, Edmonds was involved in an all-terrain vehicle accident on August 31, 2013, in which he suffered a closed "comminuted fracture of the distal radius with palmar displacement and angulation of the distal fracture fragments," or a fractured left wrist. *Id.* at 562. Bullet fragments were also identified within the soft tissue of his left hand. *Id.* He was initially treated at the Baptist Medical Center – Leake, located in Carthage, Mississippi. *Id.* Four days later, he sought treatment for worsening pain related to this injury at UMMC. *Id.* 564-574. Doctors confirmed the fractures with additional x-rays, fitted him with another splint, discharged him with pain medications, and directed him to follow up with the hand clinic in one week. *Id.* at 566, 570.

On May 5, 2014, x-rays were taken of Edmonds's left wrist and both knees. *Id.* at 577-578. Based on the three views taken of the left wrist, the radiologist noted a "cortical irregularity about the distal radial metaphysis consistent with a fracture" and evidence of an old healed fracture of the proximal 4th metacarpal. *Id.* at 577. The radiologist also noted several small metallic densities along the mid hand, which were previously identified as bullet fragments. *Id.* at 562, 577.

### III.  HEARING AND DECISION

In his October 14, 2014, decision, the ALJ evaluated Edmonds's impairments using the familiar sequential evaluation process[2] and found that he has the severe impairments of status

---

2. In evaluating a disability claim, the ALJ is to engage in a five-step sequential process, making the following determinations:

post pelvic fracture, hypertension, and osteoarthritis of the knees. *Id.* at 14. The ALJ found that Edmonds has the non-severe impairment of post tibia fracture and status post ankle fracture. *Id.* at 15. With regard to his allegation of back pain, the ALJ pointed out that while there was some mild, generalized narrowing at L5 and minimal spurring present anteriorly along the lower spine, no medical source had diagnosed his back pain as "a particular problem." *Id.* The ALJ noted that doctors had observed that Edmonds had 5/5 motor strength, that his gait was excellent, and that he walked without an assistive device. *Id.* Edmonds also described the ability to perform household activities, such as sweeping, mopping, shopping, and cooking. *Id.*

With regard to his complaints of cardiovascular disease and stomach problems, the ALJ found that there were no diagnoses to accompany these complaints. *Id.* at 15-16. Edmonds was never treated for gastrointestinal issues. The ALJ acknowledged that Edmonds's chest x-rays

---

(1) whether the claimant is presently engaging in substantial gainful activity (if so, a finding of "not disabled" is made);

(2) whether the claimant has a severe impairment (if not, a finding of "not disabled" is made);

(3) whether the impairment is listed, or equivalent to an impairment listed, in 20 C.F.R. Part 404, Subpart P, Appendix 1 (if so, then the claimant is found to be disabled);

(4) whether the impairment prevents the claimant from doing past relevant work (if not, the claimant is found to be not disabled); and

(5) whether the impairment prevents the claimant from performing any other substantial gainful activity (if so, the claimant is found to be disabled).

*See* 20 C.F.R. §§ 404.1520, 416.920. The analysis ends at the point at which a finding of disability or non-disability is required. The burden to prove disability rests upon the claimant throughout the first four steps; if the claimant is successful in sustaining his burden through step four, the burden then shifts to the Commissioner at step five. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

showed cardiomegaly, or abnormal enlargement of the heart, but there was no evidence of diagnosed cardiac impairment. *Id.* at 16. Although he had hypertension, for which he did not take medication, cardiovascular examinations were essentially normal. *Id.*

The ALJ next found that Edmonds does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. *Id.* The ALJ looked at Edmonds's hypertension, his leg fractures, the osteoarthritis of the knees, and obesity and concluded that his physical conditions did not meet the listings for these impairments. *Id.*

Considering the record, the ALJ found that Edmonds has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except he should have a sit/stand option allowing him to sit for one hour at a time and stand and/or walk for thirty minutes at a time in an eight-hour day. *Id.* at 17. The ALJ also concluded that Edmonds should not crawl, he should not climb more than five steps at a time, and that all remaining postural activities should be limited to occasional. *Id.* The ALJ also limited him to frequent manipulation of small objects. The ALJ further found that he should avoid unprotected heights and moving machinery, and that he should avoid temperature extremes, dust, fumes, smoke, and strong odors. *Id.* at 17-18.

Considering the foregoing RFC, the ALJ determined that Edmonds is unable to perform any of his past relevant work. *Id.* at 23. In particular, the ALJ found that Edmonds could not perform his past relevant work as a chicken catcher, which was considered a medium, unskilled activity with a specific vocational preparation of 2. *Id.* The ALJ observed that as he was born on May 8, 1962, he was forty-seven, or an "individual closely approaching advanced age," at the

disability onset date of October 1, 2009. *Id.* The ALJ concluded that Edmonds has a limited education and is able to communicate in English and that transferability of job skills was not at issue because his previous work was unskilled.

Considering these factors, and with the assistance of a vocational expert, the ALJ identified several jobs that exist in significant numbers in the national economy that Plaintiff can perform, as follows:

1. Self-service casher, which is considered light, unskilled work with a specific vocational preparation ("SVP") of 2.
2. Ticket seller, which is considered light, unskilled work with an SVP of 2; and
3. Dressing room attendant, which is considered light, unskilled work with an SVP of 2.

*Id.* at 24-25. The ALJ acknowledged that the *Dictionary of Occupational Titles* ("DOT") did not address sit/stand options and relied upon the vocational expert's explanation to determine that these jobs would accommodate a sit/stand option. *Id.* at 25. Thus, the ALJ concluded that Edmonds has not been under a disability from October 1, 2009, through the date of the decision, October 14, 2014.

## IV. STANDARD OF REVIEW

This Court's review is limited to an inquiry into whether there is substantial evidence to support the Commissioner's findings, *Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971), and whether the correct legal standards were applied, 42 U.S.C. § 405(g) (2006). *Accord Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). The Fifth Circuit has defined the "substantial evidence" standard as follows:

> Substantial evidence means more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It must do more than create a suspicion of the existence of the fact to be established, but "no substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence."

*Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). In applying the substantial evidence standard, the Court must carefully examine the entire record, but must refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995). Hence, if the Commissioner's decision is supported by the evidence, and the proper legal standards were applied, the decision is conclusive and must be upheld by this Court. *Paul v. Shalala*, 29 F.3d 208, 210 (5th Cir. 1994), *overruled on other grounds, Sims v. Apfel,* 530 U.S. 103 (2000).

## V. DISCUSSION OF THE ALLEGED ERRORS AND APPLICABLE LAW

Plaintiff argues that the ALJ's decision is unsupported by substantial evidence and should be reversed for the following reasons:

1. The RFC found by the ALJ is not based upon substantial evidence insofar as it failed to include reasonably all of the limitations of Plaintiff recognized by the ALJ.

2. A vocational expert's testimony based on a defective hypothetical question does not constitute substantial evidence to support an ALJ's decision.

3. A claimant's opportunity to cross-examine a vocational expert does not cure a defective hypothetical question.

[12] at 2-3.

### A. Is the RFC based upon substantial evidence?

Edmonds argues that the RFC found by the ALJ is not based upon substantial evidence in that it failed to include reasonably all of his limitations as recognized by the ALJ. This argument is two pronged, based upon the ALJ's evaluation of Edmonds's symptoms of pain, and whether the ALJ misinterpreted Dr. Tatum's evaluation of the frequency with which Edmonds can perform certain postural activities, and in particular, stoop, during a work day.

The Court first turns to Plaintiff's argument regarding his allegations of pain. Plaintiff asserts that the ALJ's opinion was internally inconsistent with regard to the credit that she gave Edmonds's allegations of pain. The ALJ's RFC limited Edmonds to light work, "except he should have a sit/stand option allowing him to sit for one hour at a time and stand and/or walk for thirty minutes at a time in an eight hour day." [8] at 17. In particular, with regard to postural activities, the ALJ went on to state that Edmonds "should not crawl; he should not climb more than 5 steps at a time; all remaining postural activities are limited to occasional." [8] at 17. However, within her discussion of Edmonds's physical conditions, she stated that she "gives the benefit of the doubt to the claimant's allegations of pain in finding that the claimant should never stoop." "Stooping" is included in the postural activities that the ALJ limited to "occasional" in the RFC. Thus, Plaintiff argues that the ALJ's statement that gives the benefit of the doubt to Edmond's allegations of pain related to stooping is at odds with the RFC, which found that he could occasionally stoop.

To prove disability resulting from pain, an individual must establish a medically determinable impairment that is capable of producing disabling pain. 20 C.F.R. §§ 404.1529(a), 416.929(a)(2016); *Ripley v. Chater*, 67 F.3d 552, 556 (5th Cir. 1995). Once a medical

impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *Id.* The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who had an opportunity to observe whether he or she seemed to be disabled. *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988). In his opinion, the ALJ fully discussed the plaintiff's medical condition based upon the records that were before him. Because the ALJ's opinion shows that he considered Edmonds's complaints of pain along with his activities and the medical evidence, the undersigned finds that the record contains substantial evidence to support the ALJ's decision and must give considerable deference to the ALJ's evaluation of the plaintiff's credibility and severity of limitations. *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991). Moreover, as discussed *infra*, the ALJ identified jobs for Plaintiff that did not require stooping. Thus, the ALJ accounted for Edmonds's stooping limitation by identifying jobs that do not require that activity. Accordingly, this argument does not provide a basis for reversal.

Plaintiff also argues that the ALJ's error in determining the RFC was created by his misinterpretation of Dr. Tatum's May 2014 Medical Source Statement due to a formatting error on the form itself. [8] at 584-587. The Medical Source Statement provides the doctor with an opportunity to evaluate the frequency with which an individual can perform several categories of postural activities, among other activities and physical functions in an eight-hour work day. The postural activities are divided into the categories of climbing, balancing, stooping, crouching, kneeling, and crawling. The form requires the physician to indicate whether each category of postural activity should be performed frequently, occasionally, or never during the work day.

In 2014, Dr. Tatum found that Edmonds could occasionally balance, crouch, or kneel.

˘14˘

On the other hand, the doctor indicated that Edmonds should never climb, stoop, or crawl.  *Id.* at 585.  Appearing on the form underneath and off-set to the right side of the "never" column heading is the parenthetical modifier "very little up to 1/3 of an 8-hour day."  In the ALJ's decision, he interpreted "very little up to 1/3 of an 8-hour day" to apply to the term "never," stating that "[a]ccording to the definition provided on Dr. Tatum's report, the term 'never' equates with the social security definition of occasional meaning, very little up to one third of the time." *Id.* at 20.  Therefore, the ALJ found that Dr. Tatum's opinion supported limiting the postural activity of climbing to five steps at a time and limiting the remaining postural activities, including stooping, to "occasional."

Edmonds argues, and the Court tends to agree, that the ALJ applied a "tortured" definition to the terms "occasional" and "never."  Moreover, for reasons not explained by the ALJ, the ALJ never sought clarification of this aspect of the form from the doctor, even though the ALJ sought clarification from the doctor about his responses in other parts of the form, [8] at 379, and this formatting confusion existed in both the 2012 and 2014 Medical Source Statements submitted by Dr. Tatum.  *Id.* at 549, 585.  Additionally, the ALJ and Plaintiff's counsel discussed the discrepancy in the definitions during the April 15, 2014, hearing.  *Id.* at 99-101.

Nevertheless, in the end, the ALJ's interpretation or misinterpretation of this aspect of Dr. Tatum's report amounts to harmless error because the ALJ determined that jobs exist in significant numbers in the economy that do not require "stooping."  *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988)(applying harmless error analysis in disability benefits context). The vocational expert identified the jobs of self-service cashier and ticket seller as being jobs that Edmonds can perform without stooping.  See [8] at 104-107.  The description of the jobs of

self-service cashier and ticket seller, as found in the *Dictionary of Occupational Titles*, and as described by the vocational expert, do not require stooping. *See Dictionary of Occupational Titles* (4th ed. 1991), 1991 WL 671853; 1991 WL 671840. Moreover, the descriptions of the jobs in the *Dictionary of Occupational Titles* indicate that none of the postural activities of climbing, balancing, stooping, kneeling, crouching, or crawling, are required for either the self-service cashier job or the ticket seller job. *See id.* Accordingly, this argument does not provide a basis for reversal.

  B. Was the vocational expert's testimony based on a defective hypothetical question?

  Plaintiff next argues that the vocational expert's testimony was based on a defective hypothetical question, therefore substantial evidence does not support the ALJ's decision. In his initial brief, Plaintiff argues that the ALJ's hypothetical question to the vocational expert did not contain the postural limitation of never stooping. [12] at 17-18. In its response, the government points out that at the April 2014 hearing, the ALJ and Plaintiff's attorney specifically asked the vocational expert about jobs without a stooping requirement, and the vocational expert identified two jobs that did not require stooping, that of self-service cashier and ticket seller. [8] at 104-107. Because the ALJ, after consulting the vocational expert, identified jobs that Edmonds could perform with the no stooping restriction, and the record shows that Plaintiff's counsel questioned the vocational expert about this restriction, this argument does not provide a basis for reversal.

  In Plaintiff's rebuttal, however, he further expands his argument to assert that the RFC is flawed because it contains a limitation exceeding that posed by Plaintiff's counsel to the vocational expert, that of "frequent manipulation of small objects." Thus, Edmonds argues that because the hypothetical question the ALJ posed to the vocational expert did not contain the

˘16˘

additional limitation of "frequent manipulation of small objects," the ALJ did not present a question to the vocational expert that fully represented his limitations. In other words, argues Plaintiff, the vocational expert was not given an opportunity to consider whether jobs with this limitation existed that Plaintiff could perform. The government did not move to respond to this argument in surrebuttal.

The Fifth Circuit has clearly stated when a defective hypothetical question will produce reversible error:

> Unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant *recognized by the ALJ*, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question), a determination of non-disability based on such a defective question cannot stand.

*Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994)(emphasis added).

Turning to the hypothetical question in this case, the undersigned finds that the hypothetical reasonably incorporated the disabilities of the claimant as recognized by the ALJ, and the vocational expert was subjected to extensive questioning by both the ALJ and Plaintiff's counsel. During the hearing held on September 16, 2014, the ALJ specifically incorporated "frequent manipulation of small objects," and other limitations that track the Plaintiff's RFC as found by the ALJ, into the hypothetical he posed to the vocational expert. [8] at 49. In response to this hypothetical, the vocational expert identified the jobs of self-service cashier and ticket seller as ones that Edmonds could perform. *Id.* at 49-50. At the previous hearing held on April 15, 2014, upon questioning by both the ALJ and Plaintiff's counsel, these jobs had been specifically identified by the vocational expert as ones that did not require stooping. *Id.* at 104-

107. Accordingly, because the fingering limitation was included in the hypothetical presented to the vocational expert by the ALJ, and the vocational expert had previously identified the jobs of ticket seller and self-service cashier as ones including the limitation of no stooping, the hypothetical was not defective, and this argument is without merit. Accordingly, substantial evidence supports the Commissioner's decision on this issue.

### C. Did claimant's opportunity to cross-examine the vocational expert cure a defective hypothetical question?

Finally, Edmonds argues that the opportunity to cross-examine the vocational expert does not "cure" a defective hypothetical. He asserts that the hypothetical was flawed because it did not meet *Bowling* in that it did not incorporate reasonably all disabilities of the claimant as recognized by the ALJ. A review of the hearing testimony and the ALJ's decision demonstrates that this position is without merit.

During the hearing on April 15, 2014, the vocational expert identified the jobs of ticket seller and self-service cashier, listed respectively as numbers 211.467-030 and 211.462-010 in the *Dictionary of Occupational Titles*, as jobs that do not require stooping. *Id.* at 104, 106-107. At that time, both the ALJ and Plaintiff's counsel questioned the vocational expert about the jobs.

After closing the April 15 hearing so that Edmonds could be re-examined by Dr. Tatum and have additional x-rays, the ALJ reconvened the hearing on September 16, 2014. *Id.* at 31. The first hypothetical question the ALJ posed to the vocational expert during the September 16 hearing reads, as follows:

> We have an individual who is 52 years old, has a limited education, previous work history as a chicken catcher, is limited to work at a light exertional level that

˘18˘

>allows for a sit/stand option, the sitting would be up to one hour at a time, the standing and walking would be up to 30 minutes at a time. In the course of an eight-hour day, the individual could alternate between those parameters. No climbing ladders, ropes, or scaffolds; no crawling; no more than five steps at a time; the remaining postural activities at the occasional, which includes pushing and pulling at occasional. Individual limited to frequent manipulation of small objects; should avoid working at unprotected heights, being around moving machinery; should avoid temperature extremes; and should avoid concentration of dusts, fumes, smoke, strong odors.

*Id.* at 49. In response to this hypothetical, the vocational expert identified the same two jobs of ticket seller and self-service cashier as she had previously identified during the April 15 hearing. *Id.* at 49-50. Implicit in this response, therefore, is the consideration that these two jobs can be performed without stooping and with frequent manipulation of small objects.

>In the ALJ's opinion, he determined that the following RFC applies to Edmonds:

>the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he should have a sit/stand option allowing him to sit for one hour at a time and stand and/or walk for thirty minutes at a time in an eight hour day; he should not crawl; he should not climb more than 5 steps at a time; all remaining postural activities are limited to occasional; he is limited to frequent manipulation of small objects; he should avoid unprotected heights and moving machinery; he should avoid temperature extremes, dust, fumes, smoke, and strong odors.

*Id.* at 17-18. This RFC essentially tracks the language of the hypothetical, and, thus, the hypothetical "reasonably" incorporates all of the disabilities of Edmonds, as recognized by the ALJ. Accordingly, the hypothetical was not "defective" under *Bowling*, and this argument does not provide a basis for reversal.

## VI. CONCLUSION

For the reasons discussed in this Memorandum Opinion and Order, the Court finds that the ALJ's decision that Edmonds is not disabled is supported by substantial evidence. Therefore, Defendant's Motion for an Order Affirming the Decision of the Commissioner [13] is hereby

granted, and Plaintiff's Motion for Summary Judgment [11] is hereby be denied. Accordingly, the Commissioner's decision is upheld, and this matter will be dismissed with prejudice.

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, a separate judgment will be entered.

SO ORDERED, this the 8th day of February, 2017.

                        /s/ F. Keith Ball
                        UNITED STATES MAGISTRATE JUDGE